UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I. B.,<br><br>  Plaintiff,<br><br>  v.<br><br>FRANK BISIGNANO, Commissioner of<br>Social Security,<br><br>  Defendant. | Case No. 3:25-cv-0986<br><br>**ORDER GRANTING SUMMARY JUDGMENT AND REMANDING**<br><br>Docket No. 12 |

Plaintiff I.B. challenges the Social Security Administration's final decision denying her disability benefits within the meaning of the Title II and Title XVI of the Social Security Act. She moves for summary judgment and immediate payment of benefits, or, in the alternative, remand for further administrative proceedings.

Having considered the parties' briefs, the Court hereby **GRANTS** the Plaintiff's motion for summary judgment and remands for further proceedings within the Social Security Administration.

## I.    BACKGROUND

### A. Procedural History

In December 2021, I.B. filed applications for Title XVI Supplemental Security Income (SSI) and Title III Social Security Disability Insurance (SSDI) benefits.  AR 485-92.  In the applications, I.B. alleged both physical and mental disability due to her lower back nerve damage, thyroid, high cholesterol, depression, bipolar disorder, and asthma.  AR 223.  I.B. alleged that she had been unable to work because of her disabling condition since December 2017.  AR 491.

I.B.'s claims were initially denied and again upon reconsideration.  AR 223, 235. I.B. then

filed a request for hearing before an administrative judge. AR 243. ALJ McLaughlin held a telephonic hearing to reconsider whether I.B. is disabled under the relevant sections of the Social Security Act. AR 48. The ALJ again denied I.B.'s claims on January 25, 2024. AR 16. A request for the Appeals Council to review the case was denied on December 9, 2024. AR 1.

### B.    Factual Background

#### 1.    Back Pain

I.B. has experienced moderate to severe back pain from 2018 to 2023. She first reported back pain in 2018, prompting her to seek medical attention. AR 712. That year, she underwent an MRI, which revealed normal vertebral body height and alignment, as well as normal disc spaces. AR 790. Following the imaging, she attended physical therapy with PT Pampolina, who diagnosed her with lumbar strain and radiculopathy. AR 713. The PT observed that walking more than 35 minutes and changing positions from standing to sitting aggravated I.B.'s pain. AR 711. In 2019, she had another MRI, which revealed mild degenerative disc disease without central canal stenosis. AR 776.

In 2020, I.B. continued to experience back pain. She had an MRI of her spine, but the imaging did not reveal any abnormalities. AR 1135. In June 2020, she was assessed with lumbago and the physical therapist recommended avoiding prolonged standing or sitting. AR 925.

In late 2021 and early 2022, I.B. attended physical therapy sessions with Ramachandra Raju Mantena at Sterling Physical Therapy. In these sessions, I.B. repeatedly tested positive for tenderness, spasm, swelling and muscle wasting in her low back. AR 899, 896, 891, 885, 883. In February 2022, I.B. was discharged due to non-compliance with her physical therapy sessions. AR 1511. The report indicates that at the time of discharge she had swelling and spasm. AR 1509. PT Mantena's discharge report also noted difficulty standing for a long time to perform bath activities and squatting to reach bottom shelves. AR 1510.

In March 2022, I.B. was examined by consultive examiner, Dr. McMillan. AR 1170. I.B.'s straight leg test produced low back pain. According to Dr. McMillan, I.B. could stand and walk cumulatively for a total of six hours per day and would be able to sit for at least six hours per day with usual breaks. *Id*.

*United States District Court*
*Northern District of California*

In July 2022, I.B. returned to physical therapy with PT Mantena. PT Mantena reported that I.B. could groom herself, bath, dress, use the toilet and prepare meals independently but also observed that I.B. "had difficulty in standing for long time to perform laundry tasks, bending to wear pants, pickup weights." AR 1520. For the next few sessions, PT Mantena observed stiffness and weakness in I.B.'s lower back. AR 1523, 1526, 1527, 1530. By late August 2022, the swelling and tenderness had reduced. AR 1531, 1547. Beginning in September 2022, however, PT Mantena recorded objective findings of moderate pain, spasm, tenderness, and decreased range of motion and muscle strength in the lumbar region. AR 1563, 1565, 1567, 1569, 1571, 1575, 1585, 1587. Although there was improvement, it was not consistent; sometimes the swelling was decreased during one appointment and then returned the following appointment. AR 1585, 1587, 1591. On October 4, I.B. was discharged from physical therapy because she needed physician approval for additional physical therapy sessions. AR 1594. The record is silent on whether she sought or received this approval for further PT.

In November 2022, Bay Area Community Health diagnosed her with lumbosacral radiculopathy. AR 1482. Six months later, in March 2023, I.B. had more imaging done. AR 1650. Her x-rays revealed a possible tiny left renal calculus, multilevel spondyloarthropathy, and aortic atherosclerosis. *Id*. In September 2023, I.B. had a chiropractic examination that revealed findings of pain and tenderness, findings of tissue and tone changes, and findings of asymmetry on sectional or segmental levels. AR 1648. The chiropractor diagnosed her with segmental and somatic dysfunction of lumbar region. *Id*. In the next appointment, the physical therapist reported some improvement in I.B.'s range of motion. AR 1650. Nonetheless, the chiropractor identified pain and tenderness and diagnosed her with (1) segmental and somatic dysfunction of lumbar region, and (2) low back pain with left-sided sciatica, unspecified back pain laterality, unspecified chronicity. *Id*.

### 2. Anxiety and Depression

I.B. reports struggling with anxiety and depression between 2018 and 2023. I.B. first reported struggling with anxiety and depression in March 2018. AR 726. In a March, 2018

doctor's appointment at Kaiser Permanente, she reported that in November 2017 a SWAT team raided her home, handcuffed her, and arrested her son. *Id*.; AR 645, 697. Since the raid, she had been unable to sleep and would wake up with nightmares. *Id*. At the March mental health appointment, she also reported working at a gas station where somebody was shot, which contributed to her anxiety and depression. AR 697. At this appointment, she was diagnosed with major depressive disorder and PTSD. In August 2018, she had several mental status examinations where her mood was marked as anxious. AR 706, 701, 697. In each of these appointments, she reported struggling with excessive worrying, crying spells, and decreased concentration. *Id*.

For the next year and a half, I.B.'s mental status was not evaluated. AR 1139, 1146, 1151, 1156, 1161, 1163. Then, between January 2020 and March 2020, she visited her PCP several times. At each visit, her PCP conducted a mental status exam, a GAD7 (Generalized Anxiety Disorder Assessment-7), and a PHQ-9 (Patient Health Questionnaire. AR 1139, 1146, 1151, 1156, 1161, 1163. While some of her mental status exams presented normal findings, others indicated moderate symptoms. *See* AR 1151 (normal mental health finding), 1146 (moderate to moderately severe depression finding on GAD7 and PHQ-9 mental health test), 1163 (same).

In late 2021, I.B. was assessed with atypical depressive disorder and insomnia by her primary care physician. AR 979. In December 2021, she had an initial psychiatric evaluation with psychiatric nurse practitioner Catvy Nguyen where she was assessed with major depressive disorder and prescribed Lexapro, Remeron, and Seroquel. AR 956. In January 2022, she was diagnosed by NP Nguyen with anxiety and depression and assessed with a Global Assessment of Functioning (GAF) scale score of 51-60. AR 946. A Global Assessment of Functioning (GAF) score is a numerical rating from 1-100 rating the severing of an individual's mental illness and how much their symptoms affect their day-to-day life. A score between 51-60 indicates moderate symptoms such as moderate difficulty in social occupational, moderate difficulty in social functioning, and occasional panic attacks. A score between 50-41 indicates serious symptoms such serious impairment in social or occupational functions or suicidal ideation.

After trying several medications, I.B. reported that Zoloft was helping a bit. AR 935. However, the Zoloft was later discontinued due to its side effects, and from May 2022 to July

United States District Court
Northern District of California

2022, I.B. reported suffering from panic attacks, excessive worrying, and trouble sleeping.  AR 1190, 1227; AR 1187, 1180.  Despite relatively normal mental status examinations with NP Nguyen in May and June 2022, I.B. was assessed with a GAF scale score of 50, indicating severe serious symptoms.   AR 1226, 1187, 1180.

In June 2022, I.B. was diagnosed with bipolar affective disorder.  AR 1279. In July and August, some of her mental status examinations indicated pressured speech and constricted affect, while others were normal.  AR 1274, 1271, 1266, 1349.  For the next few months, she had several appointments at Bay Area Community Health where she reported struggling with depression and difficulty concentrating.  AR 1463, 1475, 1486.  But her mental status exams (MSEs) during these appointments, although conducted by phone, were mostly normal.  AR 1463, 1475, 1486.  The MSEs report that I.B. was "alert" and "oriented to time, place and person," that her speech was normal in rate, rhythm and tone, that she did not exhibit any language abnormalities, auditory or visual hallucinations, that her thought content was coherent, relevant, and logical, that her impulse was unimpaired and that her higher cognitive functioning was in the normal range.  *Id*.  But these MSEs also reported that her mood was "anxious" and "depressed," as opposed to "euthymic," which would indicate she was within normal limits.  *Id*.

Over the course of 2023, I.B. went to six appointments at Bay Area Community Health.  In each appointment, she reported struggling with high depression and high anxiety but denied difficulty concentrating or paying attention.  AR 1499, 1595, 1626, 1643, 1652, 1673. Her mental status examinations during this period were largely within normal limits (she was alert, did not exhibit any language abnormalities, did not appear to have any hallucinations, and that her thought progress was coherent, relevant and logical), other than her mood and affect being marked as anxious and depressed.  AR 1499, 1595, 1626, 1643, 1652, 1673.

### 3. Hearing Testimony

At her hearing before the ALJ, I.B. testified that she suffered from both physical and mental impairments. With respect to her physical impairments, she stated that she struggles with back pain. This pain has made it harder for her to lift things more than ten pounds.  AR 59-60.

She reported being unable to lift a gallon of milk.  AR 61.  She reported that she spends most her time lying down.  AR 60.  She testified that she is not able to stand for very long, she must elevate her feet at least three times a day, and that she was not able to stand for more than ten minutes without the need to sit down.  AR 60.  Changing positions, from sitting to standing, is also very painful for her.  AR 63.  She must take frequent breaks when she walks more than 10 minutes. AR 60. Even sitting for long periods of time is difficult for her.  AR 61.  As a result, she has difficulty accomplishing errands such as grocery shopping, laundry, cooking, dressing and cleaning alone and usually requires assistance from her daughter-in-law.  AR 62.

I.B. testified that she has problems with concentration, interacting with others, and struggles with anxiety and depression.  AR 61, 63, 64.  She also reported struggling with panic attacks once a week and a persistent sense of fear that made her sometimes afraid to leave her house on her own.  AR 64-65.  During the hearing, she cited two events that may have induced her panic attacks and sense of fear.  First, while she worked at a gas station, she witnessed gang members shoot and kill a young man.  Then, in November 2017, SWAT came and dragged I.B. out of her house.  AR 65.  According to I.B., these events triggered her anxiety and depression. AR 65.  She testified that she cannot follow a movie or even watch TV, and that she spends her time in her room.  AR 61.  In her room, she listens to music or plays games on her phone in short bursts.  AR 61-2.  She testified that based on her symptoms, she would miss more than two days of work a month and that she would not be able to stay focused for 85% of the workday.  AR 66.

### 4. Medical Opinions

#### a. Celeste Pampolina

Celeste T. Pampolina, a physical therapist (PT), treated I.B. in July 2018. She observed that I.B. had signs and symptoms of lumbar straight/sprain and radiculopathy with poor lower extremity flexibility.  AR 713.  She recommended that I.B. avoid prolonged positions, stretch/change position every hour, and to avoid sitting on soft chairs.  AR 713.  The ALJ rejected PT Pampolina's recommendation to avoid prolonged positions, stretch/change position every hour, and to avoid sitting on soft chairs as not supported by "actual findings" and not "consistent

with the quite minimal imaging and physical examination findings overall." AR 37.

### b. Raju Mantena

Raju Mantena, a physical therapist (PT) treated I.B. numerous times in 2021 and 2022. In his treatment of I.B., PT Mantena identified moderate to severe pain, spasm and tenderness, stiffness and weakness, and reduced muscle strength and range of motion at almost every appointment. AR 920, 887, 899, 897, 893, 883, 507, 1519, 1523, 1525, 1527, 1529, 1531, 1551, 1557, 1565, 1567, 1569, 1571, 1573, 1575, 1585. He assessed that I.B. had difficulty with bending and "standing straight for a long time." *See e.g.*, AR 916, 507, 1519, 1541, 1517. He reported that I.B. was able to bath, groom, and eat independently. AR 1519, 1541, 1575, 1587. The ALJ did not evaluate PT Mantena's opinion.

### c. Dr. McMillan

Dr. Eugene McMillan is a state examiner who examined I.B. once. AR 1168. He observed that I.B. did not limp, was full weight bearing, and had a normal Romberg and tandem. AR 1170. He reported that I.B.'s straight leg raising produced low back pain, and she needed help when returning from supine to a sitting position. *Id*. Based on his observations, he concluded that the claimant could stand and walk cumulatively for a total of six hours per day and would be able to sit for at least six hours with breaks. AR 1170. The ALJ held that these findings and recommendations were supported by the "minimal imaging findings" and "minimal physical examination findings." AR 38.

### d. Drs. Bobba and Amini

Drs. Bobba and Amini are state medical consultant, nonexamining physicians. AR 88. They reviewed I.B.'s records and concluded she had a residual functional capacity that could support light work. AR 94; AR 128. Based on their review, they determined that I.B. is able to lift/and or carry up to 20lbs, occasionally and 10lbs. frequently, sit about 6 hours is an 8-hour workday, and stand and/or walk 6 hours in an 8-hour workday, frequently climb ramps and stairs,

United States District Court
Northern District of California

balance, kneel, crouch, crawl and occasionally climb ladders, ropes or scaffolds and stoop.  AR 109-110.  They also claimed that Dr. McMillan's findings overestimated the severity of I.B.'s limitations.  AR 156.  The ALJ found their opinions generally persuasive.  AR 38.

### e.   Dr. Brode

Dr. Tawnya Brode is a psychologist and state agency consultant.  She also reviewed I.B.'s medical records but did not examine I.B. herself.  AR 179.  Dr. Brode opined that I.B. had a mild restriction in understanding, remembering or applying information and interacting with others, and moderate limitations to concentrate persist or maintain pace, and adapt or manage herself.  AR 185-188. She recommended a limitation for "detailed but not complex tasks" and opined that I.B. "would benefit from a generally stable setting."  AR 188.  The ALJ found Dr. Brode's opinion "primarily persuasive" but rejected her recommendation for a moderate adaption limitation and a "generally stable setting."   AR 30.

### C.  ALJ Determination

ALJ McLaughlin employed the five-step sequential process to determine whether I.B. was disabled.  *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).  Under that framework, if an ALJ finds that the claimant is disabled at a given step, then the ALJ does not need to proceed to the next step.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  If the ALJ does not find that the claimant is disabled, the ALJ will continue to the next of four additional steps. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.902(a)(4).  Here, Plaintiff disputes the ALJ's step three and four determinations.

At step one, ALJ McLaughlin considered whether Ms. Baragan was engaged in substantial gainful activity.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.92(a)(4)(i).  She found that I.B. had not engaged in substantial gainful activity since December 31, 2017, i.e. the alleged disability onset date.  *See* AR 24.

At step two, ALJ McLaughlin evaluated whether I.B. suffered from a "severe medically determinable physical or mental impairment, or combination of impairments" for continuous

8

period of at least 12 months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii); see also 20 C.F.R. §§ 404.1509, 416.909. The ALJ determined that I.B. suffered from the following severe impairments: "aortic atherosclerosis, hypertension, degenerative disc disease of the lumbar spine, metatarsal fracture with tarsal tunnel syndrome, posttraumatic disorder (PTSD), major depressive disorder, and bipolar affective disorder." *See* AR 25.

At step three, if an impairment or combination of impairments meets or is equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 in both duration and severity, then the ALJ must find the claimant to be disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). ALJ McLaughlin concluded that I.B.'s impairments did not meet or equal a listed impairment. AR 26. With respect to I.B.'s mental impairments, the ALJ assessed her symptoms according to "paragraph B" but found they were not satisfied. AR 28.

At step four, ALJ McLaughlin determined whether I.B.'s residual functional capacity allowed her to perform her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.930(a)(4)(iv). With respect to I.B.'s physical residual functional capacity, ALJ McLaughlin found that she has the ability to perform light work, and that she "can occasionally climb stairs and ramps; can never climb ladders, ropes, and scaffolds; can occasionally stoop, kneel, crouch, and crawl." AR 30. With respect to I.B.'s residual mental functional capacity, the ALJ concluded that I.B. "could carry out detailed, but not complex instructions and tasks." *Id.* Based on the physical and mental residual functional capacity assessed, the ALJ found that I.B.'s was able to perform past relevant work as a cashier II and cashier checker. AR 40. As a result, the ALJ did not engage in Step 5's assessment of the available of jobs in the economy I.B. could perform in light of her residual functional capacity.

## II.   LEGAL STANDARD

After a final decision on a claim for benefits has been issued, a claimant may seek judicial review of that decision by a district court. 42 U.S.C. § 405(g). A court may reverse the Commissioner's denial of disability benefits only when the Commissioner's findings are (1) based on legal error or (2) are not supported by substantial evidence in the record. *Lingenfelter v.*

United States District Court
Northern District of California

*Astrue*, 504 F.3d. 1028, 1035 (9th Cir. 2007).  Discrediting a claimant's testimony without adequate explanation may constitute legal error.  *See e.g.*, *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1106 (9th Cir. 2014).  "Substantial evidence" means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion.  *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006).  In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

### III.   DISCUSSION

#### A.   Whether the ALJ's Determination Was Supported by Substantial Evidence

I.B. contends that the ALJ's determination that I.B. could engage in cashier work was not supported by substantial evidence.  Specifically, she contends that (1) the ALJ's medical opinion findings were not supported by substantial evidence; and (2) the ALJ's RFC finding failed to account for I.B.'s mental and social limitations.

"Substantial evidence" means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006).  In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

1.   Whether the ALJ's evaluation of the medical record was supported by substantial evidence.

Under the new regulations, "an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).  "The agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source, and explain

United States District Court
Northern District of California

10

how it considered the supportability and consistency factors in reaching these findings." *Id*. Supportability concerns how "a medical source supports a medical opinion" with relevant evidence, while consistency concerns how "a medical opinion is consistent with the evidence from other medical and nonmedical sources." *Id*. at 791-92.

### a. Celeste Pampolina

Celeste T. Pampolina, a physical therapist (PT), treated I.B. once in July 2018. During this visit, I.B. reported intermittent lower back pain, particularly at night, that was aggravated by walking more than 35 minutes and changing from a sitting to a standing position. AR 712. PT Pampolina conducted a lumbar spine x-ray, which returned normal findings. AR 712. She found I.B.'s lumbar range of motion to be generally within normal limits, her hip range of motion to be within functional limits, her straight leg test to be negative (no pain), and that palpation produced no tenderness. AR 712-713. PT Pampolina found that hip special tests produced stiffness and noted that I.B. showed rounded shoulders and a flattened lumbar lordosis. AR 713. She assessed I.B. with symptoms of lumbar strain/sprain/radiculopathy with poor lower extremity flexibility, and recommended I.B. avoid prolonged positions, stretch/change position every hour, and avoid sitting on soft chairs. AR 713. The ALJ rejected PT Pampolina's recommendation to avoid prolonged positions and stretch/change position every hour as not supported by "actual findings" and not "consistent with the quite minimal imaging and physical examination findings overall." AR 37.

The ALJ's decision to reject PT Pampolina's recommendation was not supported by substantial evidence. While the ALJ accurately noted that some of the tests PT Pampolina conducted produced normal results, PT Pampolina also observed physical symptoms in I.B. that supported a diagnosis for lumbar strain and radiculopathy. Normal x-rays and a negative straight leg test are not necessarily inconsistent with PT Pampolina's diagnosis or her recommendation to avoid prolonged positions. *See e.g.*, *Darla C. v. Comm'r of SSA*, No. 3:18-cv-05446-DWC, 2018 U.S. Dist. LEXIS 192284, at *7 (W.D. Wash. Nov. 9, 2018) (finding "normal range of motion in some joint areas and a normal x-ray [was] not necessarily inconsistent" with provider's opinion

11

about claimant's ability to stand, walk, and sit, in light of other symptoms). PT Pampolina's recommendation was thus not inconsistent with her own findings. Further, I.B.'s symptoms appear to have worsened, not improved, since PT Pampolina's initial evaluation in 2018. For example, when Dr. McMillan examined I.B. in 2022, he found that her straight leg test was positive. AR 1170. And I.B. testified at her hearing testimony that she is not able to stand for more than ten minutes and that she cannot sit or walk for very long. AR 60. The ALJ's rejection of PT Pampolina's opinion is thus also inconsistent with the larger medical record and the record as a whole.

### b. Raju Mantena

PT Mantena from Sterling Physical Therapy saw I.B. at least 25 times in late 2021 and 2022. In his treatment of I.B., PT Mantena identified moderate to severe pain, spasm and tenderness, stiffness and weakness, and reduced muscle strength and range of motion at almost every appointment. AR 920, 887, 899, 897, 893, 883, 507, 1519, 1523, 1525, 1527, 1529, 1531, 1551, 1557, 1565, 1567, 1569, 1571, 1573, 1575, 1585. He also noted that I.B. has difficulty with bending and prolonged standing and sitting. AR 916, 507, 1519, 1541. He repeatedly assessed that I.B. had difficulty in "standing straight for a long time." *See e.g.*, AR 1517.

At times, PT Mantena reported that I.B. was improving. He noted that the localized tenderness and swelling had reduced and that I.B. was able to bath, groom, and eat independently. AR 1519, 1541, 1575, 1587. But this progress was not consistent. In appointments that were close in time, I.B. sometimes showed short-lived improvement in swelling and tenderness, but the symptoms would return. AR 1531, 1540, 1541, 1551, 1573, 1575, 1585, 1587.

The ALJ's decision notes that in "early and mid to late 2022, [I.B.] had physical therapy (PT) with some diminished trunk strength and lumbar ROM with some noted improvement" but otherwise does not evaluate the PT Mantena's findings, including his repeated finding that I.B. had difficulty with prolonged sitting and standing positions. AR 37. In fact, the ALJ does not discuss PT Mantena by name at all. But the ALJ must "must articulate how persuasive it finds all of the medical opinions from each doctor or other source." *Woods*, 32 F.4th at 792 (emphasis

United States District Court
Northern District of California

added); *Kimberly J. v. Acting Comm'r of Soc. Sec.*, No. 2:22-cv-1421-TLF, 2023 U.S. Dist. LEXIS 88134, at *13 (W.D. Wash. May 19, 2023) (under post-2017 regulations, opinion cannot be discounted because it is rendered by physical therapist).  The ALJ was also required to consider PT Mantena's findings to evaluate the "consistency" of other opinions with the record, particularly since those findings, if accurate, would be highly probative to I.B.'s claimed physical limitations. The ALJ's failure to evaluate PT Mantena's findings was error.  *See Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir. 2015) ("[A]n ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them."); *Garrison v. Colvin*, 759 F.3d 995, 1012-13 (9th Cir. 2014) ("[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it").

### c. Dr. McMillan

Dr. Eugene McMillan is a state examiner who examined I.B. once in March, 2022.  AR 1168.  He observed that I.B. did not limp, was fully weight bearing, and had a normal Romberg and tandem.  AR 1170.  Her straight leg raising produced low back pain, and she needed help when returning from supine to a sitting position.  *Id*.  Dr. McMillan opined that I.B. could stand and walk cumulatively for a total of six hours per day and that she would be able to sit for at least six hours with "usual breaks."  AR 1170.  Dr. McMillan did not explain in his opinion what in I.B.'s physical symptoms led him to his conclusion that she could stand, sit, and walk for six hours per day.  The ALJ accepted these findings and recommendations as supported by Dr. McMillan's "minimal imaging findings" and "minimal physical examination findings."  AR 38.

Substantial evidence does not support the ALJ's acceptance of Dr. McMillan's opinion. As to supportability, the ALJ misstated Dr. McMillan's finding.  The ALJ stated that at I.B.'s appointment with Dr. McMillan, she "did not need help when returning from a supine to seated position," AR 37, but to the contrary, Dr. McMillan's assessment clearly states that I.B. "did need help when returning from a supine to a sitting position," AR 1170.  Moreover, the mere fact that I.B. did not limp and did not present with balance problems does not support Dr. McMillan's opinion that she could stand and sit for prolonged periods of six hours.  As to consistency, the ALJ

did not evaluate whether Dr. McMillan's opinion was consistent with PT Mantena's evaluations, which occurred within a month of Dr. McMillan's. *See* AR 1507. The ALJ did not evaluate, for example, whether PT Mantena's objective findings of severe pain, spam, reduced range of motion, and decreased muscle strength were consistent with Dr. McMillan's opinion that I.B. could stand, sit and walk for six hours a day. *Id.* The ALJ failed to meaningfully assess the inconsistency between these medical findings. The ALJ also did not evaluate the inconsistency between Dr. McMillan's opinion and I.B.'s testimony that testimony she is not able to stand for more than ten minutes and that she cannot sit or walk for long. AR 60. Substantial evidence did not support the ALJ's acceptance of Dr. McMillan's opinion that I.B. could sit, stand, and walk for six hours.

### d. Drs. Bobba and Amini

Drs. Bobba and Amini are state medical consultant, nonexamining physicians. AR 88. They reviewed I.B.'s records and concluded she had a residual functional capacity that could support light work. AR 94; AR 128. Based on their review, they determined that I.B. is able to lift/and or carry up to 20lbs, occasionally and 10lbs. frequently, sit about 6 hours is an 8-hour workday, and stand and/or walk 6 hours in an 8-hour workday, frequently climb ramps and stairs, balance, kneel, crouch, crawl and occasionally climb ladders, ropes or scaffolds and stoop. AR 39; 109-110. They also claimed that Dr. McMillan's findings overestimate the severity of I.B.'s limitations. AR 158. The ALJ did not find Drs. Bobba and Amini's opinions entirely persuasive but found their functional opinions persuasive as consistent with "minimal imaging findings," "minimal physical examinations findings[,]" and "minimally observed pain." AR 39.

Substantial evidence does not support the ALJ's consistency finding. For example, PT Mantena—whose findings the ALJ did not evaluate—repeatedly recorded objective findings of "severe pain," which contradicts the ALJ's statement that the entire record shows minimally observed pain. AR 887; 891; 897; 904; 928. This characterization is also contrary to that of I.B.'s chiropractor at Bay Area Health, who reported that I.B. had pain when he examined her range of motion and diagnosed her with segmental and somatic dysfunction in the lumbar region and left sciatica. AR 1650, 1681. These records appear to conflict with Drs. Bobba's and Amini's

14

conclusions, which were based solely on a paper review of the medical records. Drs. Bobba and Amini's findings were also not consistent with the findings of I.B.'s primary care physician Dr. Khuddus, who assessed I.B. with lower back pain, lumbago, and sciatica on several occasions, AR 1165, 1114, 980, 976, nor the findings of her providers at Bay Area Health, who repeatedly diagnosed I.B. with lumbosacral radiculopathy, AR 1482, 1686, 1659. Those records appear to have been largely ignored by Drs. Bobba and Amini. Again, the ALJ failed to meaningfully assess the inconsistency of the medical evidence, essentially ignoring the assessment of I.B.'s primary physician. Substantial evidence thus did not support the ALJ's finding that Dr. Bobba and Amini's opinions were consistent with the medical record. Their findings are also inconsistent with I.B.'s testimony about her inability to stand and walk for long periods of time. AR 60. The ALJ thus erred to the extent she accepted their opinions.

### e. Dr. Brode

Dr. Tawnya Brode is a state psychologist who reviewed I.B.'s medical records. AR 179. She opined that I.B. had a mild restriction to understand, remember or apply information and interact with others, and moderate limitation to concentrate persist or maintain pace, and adapt or manage oneself, AR 185-188, including a "moderately limited" ability to respond appropriately to changes in the work setting. AR 187. Dr. Brode opined that I.B. would "benefit from a generally stable setting which would help reduce stress." AR 188. The opinion found that she could follow detailed but not complex instructions and that she was "likely to be impacted by affective instability and anxiety." AR 187. The ALJ found Dr. Brode's opinion "primarily persuasive" but found the moderate adaption limitation and the recommendation for a "generally stable setting" to be unpersuasive as vague, not consistent with activities of daily living, and the "minimal and only short lived positive MSE [Mental Status Examination] findings." AR 30.

The ALJ's partial rejection of Dr. Brode's opinion is not supported by substantial evidence. First, I.B.'s activities of daily living were not inconsistent with mental limitations. She testified that she spends most of her time in her room, experiences panic attacks, and requires assistance from her daughter-in-law with some chores. AR 61, 65, 62, 67. The fact that I.B. plays

15

United States District Court
Northern District of California

phone games, goes on short walks, and once referenced gardening is not inconsistent with an adaptive limitation.[1]  AR 36; *see Ferguson v. O'Malley*, 95 F.4th 1194, 1203 (9th Cir. 2024) ("Only if the level of activity [is] inconsistent with Claimant's claimed limitation do daily activities have any bearing on Claimant's credibility.") (internal quotations marks and citations omitted).

Second, the ALJ described as "minimal and only short lived positive" Mental Status Examination findings, but I.B. consistently received a score of 50 in 2022 and 2023 on her global assessment functioning test.  AR 1183, 1269, 1466, 1478, 1489, 1502, 1598, 1629, 1646, 1655, 1676.  As noted above, a score of 50 indicates serious symptoms or impairment. *See* https://iaap.org/wp-content/uploads/2020/01/GAF-Scale.pdf. On occasion, her symptoms improved and she was assigned a higher score in the 51-60 range. AR 935, 946, 959, 1228. However, even a score in the 51-60 ranges indicates moderate mental health symptoms (such as panic attacks) or moderate difficulty in social or occupational environments. *See* https://iaap.org/wp-content/uploads/2020/01/GAF-Scale.pdf.  In addition to anxiety and depression, I.B. was also diagnosed with PTSD and bipolar disorder. AR 697, 1281.

Further, although the ALJ described I.B.'s mental health symptoms as short-lived, there is no substantial evidence that her mental health has improved over time.  Even in 2023, I.B. consistently reported very high levels of depression and anxiety in her appointments with Bay Area Community Health.  AR 1499, 1595, 1626, 1643, 1652.  Instead of "euthymic," which would indicate I.B. was within normal limits, her mood was consistently reported to be anxious.  AR 959, 945, 934, 1226, 1187, 1180, 1274, 1266, 1463, 1475, 1486, 1499, 1595, 1626, 1643, 1652, 1673. Although I.B. has attempted to mitigate her symptoms for these illnesses with various medications such as Zoloft and Lexapro, these attempts have not been successful.  She had to discontinue Zoloft and Lexapro after experiencing side effects and in 2023, she reported that her medication for her bipolar disorder has not been effective.  AR 1187; AR 1626, 1643, 1652, 1673.  I.B.'s

---

[1] The record only contains a single reference to I.B.'s gardening activity.  AR 126.  The reference is from 2018, which is very early in the record.  *Id*.  There is no indication that I.B. continued to garden after 2018.  The reference also does not specify the intensity of her gardening. I.B. may just been occasionally watering plants.

mental health symptoms were not short-lived.

The only remaining ground for the ALJ's rejection of the limitation of a need for "a generally stable setting" is that it was "vague." But labelling a recommendation "vague," without further explanation, is not sufficient. *See Taniya T. v. Comm'r SSA*, No. 6:19-cv-01503-IM, 2020 U.S. Dist. LEXIS 152149, at *12 (D. Or. Aug. 21, 2020) (ALJ erred in stating that state agency psychologist's recommendation was "vague" without supporting rejection of the opined limitation with record evidence.) This is particularly so where the core of the limitation is comprehensible even though its precise contours may be vague. If the ALJ had questions about what Dr. Brode meant by this recommendation and how more precisely it might apply, it was the ALJ's duty to investigate further, not simply reject the recommendation. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered."); *Marlou H. v. Bisignano*, No. 3:24-cv-02118-AHG, 2026 U.S. Dist. LEXIS 33279, at *21 (S.D. Cal. Feb. 18, 2026) ("Where evidence is ambiguous, or where the ALJ himself recognizes that the record is inadequate to permit proper evaluation, the duty to conduct an appropriate inquiry is triggered.").

On this record, substantial evidence does not support the ALJ's rejection of Dr. Brode's recommendation for a moderate adaptive limitation and a "generally stable setting" limitation.

**B. Did the ALJ properly account for I.B.'s mental and social limitations in the RFC?**

In determining I.B.'s RFC, the ALJ included no mental limitations beyond a limitation for detailed but not complex instructions and tasks. Although the ALJ properly determined the RFC to reflect I.B.'s limitations in interacting with others and concentrating, the ALJ failed to account for the moderate adaptive limitation recommended by Dr. Brode and Dr. Brode's recommended limitation of a "generally stable setting."

2. <u>Mild limitation interacting with others</u>

The ALJ did not err in assessing I.B. with only a mild limitation in interacting with others. Plaintiff's only record evidence to support a more severe limitation is several examples where she required encouragement or accompaniment to go out or demonstrated her general irritability

17

(including appointments where she ranked her irritability as a 4/10).  AR 555, 556, 1222, 1463, 1475, 1486, 1499, 1595, 1626, 1643.  However, even crediting these examples, it would be reasonable to conclude, as the ALJ did, that the evidence supports only a mild limitation in Plaintiff's interacting with others.

3. Mild limitation in adapting or managing oneself

As discussed above, the ALJ's rejection of Dr. Brode's recommendation that I.B. had a moderate adaptive limitation was not supported by substantial evidence.  Accordingly, the ALJ's finding that I.B. only had a mild, rather than moderate, adaptive limitation was also not supported by substantial evidence.

4. Does the ALJ's RFC determination adequately account for I.B.'s limitations in concentration and adaptation?

At step three, the ALJ concluded that I.B. had a moderate limitation concentrating, persisting or maintaining pace.  AR 29.  At step four, the ALJ assessed I.B.'s residual functional capacity and included one mental limitation: restricting her to carrying out detailed, but not complex instructions and tasks.  I.B. does not dispute the ALJ's finding that she had a moderate limitation in this concentrating, persisting or maintain pace but argues that a limitation prohibiting her only from engaging in complex instructions and tasks does not adequately address the breadth of her moderate limitation.

An "assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with the restrictions identified in the medical testimony." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008); *see also Phillips v. Colvin*, 61 F. Supp. 3d 925, 940 (N.D. Cal. 2014) (ALJ did not err in translating concentration, persistence, or pace limitation into RFC as a restriction to "simple tasks" because the medical record supported this limitation).  In *Stubbs*, although the claimant had pace and mental limitations, the medical testimony did not support any "concrete limitations" in the RFC beyond the limitation to simple tasks that the ALJ included.  *Id.* at 1175.

The same is true here. Although the ALJ recognized a moderate limitation for

concentrating, persisting, or maintaining pace, the medical testimony provided no additional concrete limitations that the ALJ should have included in the RFC.  The ALJ accepted as persuasive the opinion of Dr. Brode, who assessed claimant with moderate limitation in concentrating, persisting or maintaining pace and that she could maintain concentration, persistence, or pace for detailed but not complex instructions.  AR 30.  The ALJ's finding of moderate (without additional limitations) is consistent with I.B.'s own statements at mental health appointments in 2023, where I.B. denied difficulty concentrating.  AR 1499, 1595, 1626, 1643, 1652, 1673.  I.B. does not identify other concrete limitations in the medical evidence that the ALJ should have included and the Court does not find any in its independent evaluation of the record.  *See* Dkt. No. 12 at 16 (plaintiff citing only to claimant's testimony to support additional RFC limitations).

The Court finds that the ALJ's RFC determination adequately accounted for I.B.'s moderate limitation concentrating, persisting or maintaining pace.  However, as discussed above, the ALJ improperly rejected Dr. Brode's recommendation that I.B. be limited to a "generally stable setting" for no reason other than that it was "vague."  This "generally stable setting" recommendation is a concrete restriction identified in the medical testimony to account for I.B.'s moderate adaptive limitation and it should accordingly have been included in the RFC.  *See* *Stubbs*, 539 F.3d at 1175.

### C.  The ALJ Improperly Discredited I.B.'s Testimony

To determine whether a claimant's testimony is credible, an ALJ must engage in a two-step analysis.  *Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1035-36).  First, she must determine if the claimant has "presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1035-36 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted)). If the claimant meets this first step, "and there is no evidence of malingering," the ALJ then proceeds to the second step wherein the ALJ "may reject the claimant's testimony regarding the severity of [his] symptoms

United States District Court
Northern District of California

only if [s]he makes specific findings stating clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

The Ninth Circuit has held that an ALJ does not meet this standard "by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Instead, the ALJ must "specify which testimony she finds not credible, then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination;" otherwise, the ALJ will have "committed legal error." *Id.; see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.").

Here, the ALJ concluded that I.B. had presented objective medical evidence that could reasonably be expected to cause the alleged symptoms and did not find evidence of malingering. AR 32. Thus, the ALJ needed to provide clear and convincing evidence for rejecting I.B.'s testimony about "the intensity, persistence and limiting effects of [her] symptoms." *Id.* As to I.B.'s physical symptoms, the ALJ failed to do so.

### 1. Physical Symptoms

The ALJ discredited I.B.'s testimony about the intensity of her back pain, finding her "alleged exertional limitations and need to lie down and elevate her legs" is inconsistent with the medical record. AR 39. But while the ALJ summarized I.B.'s medical history, she did not identify specific evidence within that medical history that was inconsistent with I.B.'s testimony. As the Ninth Circuit has held, "summarizing the medical evidence" and writing that "the functional limitations resulting from the claimant's impairments were less serious than she has alleged" does not constitute clear and convincing evidence. *Brown-Hunter v. Colvin*, 806 F.3d 487, 491, 494 (9th Cir. 2015). Here, the ALJ did not link any specific medical evidence to I.B.'s testimony about her physical symptoms and explain why the former rendered the latter not

credible. AR 36-39. She did not point to medical evidence contradicting the claimed symptoms. Accordingly, the ALJ failed to provide clear and convincing reasons to discredit I.B.'s testimony about her physical symptoms. AR 36-39.

I.B.'s testimony, including that she is not able to stand for more than ten minutes, that she cannot sit or walk for very long, and that changing positions is painful for her, is consistent with medical opinions that the ALJ failed to evaluate or rejected without substantial evidence. For example, as discussed above, the ALJ failed to consider PT Mantena's opinion that I.B. had difficulty in standing straight for a long time and rejected PT Pampolina's recommendation that I.B. avoid prolonged positions. The ALJ also credited without substantial evidence Dr. McMillan's opinion that I.B. could sit, stand, and walk for six hours, which is contradicted by I.B.'s testimony. The ALJ's failure to provide clear and convincing reasons to discredit I.B.'s testimony about the severity and impact of her physical symptoms reinforces the Court's conclusion that the ALJ erred in evaluating the medical record as to I.B.'s physical disabilities.

### 2. Mental Health

I.B. testified that she was "doing nothing during the day and stated that she cannot follow a movie, watch television, or have friends," and that "her anxiety and difficulty concentrating would cause her to miss more than two days of work a month and that she would not be able to stay focused for 85% of the workday." AR 66. The ALJ found that Plaintiff's testimony about the severity of her mental health symptoms was inconsistent with (1) Plaintiff's medical records and (2) Plaintiff's activities of daily life. While the purported inconsistencies the ALJ identified in Plaintiff's activities of daily life are not wholly convincing, the ALJ's rejection based on the medical record is. Dr. Brode, a psychologist, evaluated I.B.'s medical record and found that she had moderate limitations in both concentration and adaptation. This evaluation was favorable to I.B. in that Dr. Brode recommended more stringent limitations than the ALJ ending up adopting. Yet Dr. Brode opined that these limitations could be accommodated by limiting I.B. to "detailed but not complex tasks" and a "generally stable setting." I.B.'s claimed symptoms are inconsistent with the recommendation from her most favorable evaluator and are not consistent with the remaining medical record. The ALJ's rejection of I.B.'s mental health testimony was supported

United States District Court
Northern District of California

21

by clear and convincing evidence.  The ALJ thus did not err in rejecting her mental health testimony.  The ALJ's only error as to I.B.'s mental health symptoms was failing to adopt the moderate adaptive limitation and associated "generally stable setting" RFC limitation recommended by Dr. Brode.  However, as discussed above, the ALJ erred in her assessment of I.B.'s *physical* symptoms, both as to the medical record and as to I.B.'s testimony on these symptoms.

### D.  Harmless Error

When an ALJ commits legal error, this Court may uphold the decision only if that error was harmless.  *Treichler v. Commissioner of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).  "[A]n error is harmless only if it is inconsequential to the ultimate nondisability determination."  *Brown Hunter*, 806 F.3d at 494 (internal quotations omitted).  The Ninth Circuit has been "cautious about when harmless error should be found."  *Brown-Hunter*, 806 F.3d at 492.  The burden of showing that an error is harmful falls upon the party attacking the agency's determination.  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

In this case, the Court finds that the ALJ failed to discuss or rejected without substantial evidence multiple medical opinions that aligned with I.B.'s testimony about her physical symptoms and limitations.  The ALJ also improperly rejected Dr. Brode's opinion that I.B. had a moderate, rather than mild, adaptive limitation, and required a "generally stable setting," and improperly discounted I.B.'s testimony as to the severity of her physical symptoms.  Each of these errors impact the ultimate disability determination. For example, had the ALJ credited Dr. Brode's recommendation on adaptability limitations, this would have affected the RFC, in turn affecting whether I.B. could conduct her prior work as a cashier.  Accordingly, I.B. has established harmful error.

### E.  Remand

I.B. requests that the Court to grant summary judgment in her favor and remand for immediate payment of benefits. *See* Dkt. No. 12 at 1.

"[W]hen 'the record before the agency does not support the agency action, ... the agency has not considered all relevant factors, or ... the reviewing court simply cannot evaluate the challenged agency action on the basis before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1099 (9th Cir. 2014) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S. Ct. 1598, 84 L. Ed. 2d 643 (1985)). Further proceedings are "generally useful" where "there is a need to resolve conflicts and ambiguities." *Id.* at 1101. The Court may order an immediate award of benefits only if: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Garrison v. Colvin,* 759 F.3d 995, 1020 (9th Cir.2014). "[A] reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony." *Dominguez v. Colvin*, 808 F.3d 403, 408 (9th Cir. 2016). Where "an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency." *Treichler*, 775 F.3d 1090, 1105 (9th Cir. 2014).

The conditions for immediate award of benefits are not satisfied here. The ALJ may need to conduct further factfinding on how to incorporate Dr. Brode's "generally stable setting" recommendation into the RFC. And even if the improperly discredited evidence were credited as true, the ALJ would not necessarily be required to find I.B. disabled on remand. The ALJ's analysis stopped at Step 4, after the ALJ determined that I.B. could perform her past relevant work as a cashier. Had the ALJ credited the improperly discredited evidence, she would have likely found that I.B. could not perform such work. But this is not the end of the analysis. The ALJ would then have to undertake the Step 5 analysis to see if there are other jobs in the national economy that I.B. could perform. Further administrative proceedings are thus necessary.

Accordingly, the Court reverses and remands for further proceedings. *See Brown-Hunter*, 806 F.3d at 495; *Anderson v. Saul*, 783 F. App'x 697 (9th Cir. 2019).

United States District Court
Northern District of California

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion for summary judgment. The Court reverses and remands for further proceedings consistent with the above.

**IT IS SO ORDERED**.

Dated: 6/30/2026



_____

EDWARD M. CHEN

United States District Judge